Good morning, everyone. Welcome to the Ninth Circuit. We are very pleased to be here with you today. We will hear the cases in the order that they appear on the calendar. So let me call the first case has been submitted on the briefs. That's Singh v. Sessions. But the second case, Goraya v. Sessions, we were prepared to hear argument when I assume you were counsel for petitioner. If you could please come up. Oh, yes. Well, our calendars are not updated yet. Yes. So Goraya v. Whitaker is the case. So whenever you're ready. Can you turn that microphone toward you? I tend to be loud. I didn't want to. That's OK. We'll appreciate the projections. That's fine. Good morning. As I said, I'd like to reserve two minutes for rebuttal. In all seriousness, can you just stand right in front of the microphone? It's in part because we're taping it, and it doesn't pick it up as well if you're a little bit away. I understand. Thank you. OK. We'll give you that extra 20 seconds back. Thank you so much. So in the matter of Harprit Singh Goraya, Alexander Jacobs for the petitioner. And I would like to begin with a discussion of the standard of review in this case. So the immigration judge and the BIA's opinions both use the word demeanor at numerous points. However, none of the adverse credibility findings as affirmed by the BIA are truly nonverbal demeanor findings such that this Court would give special deference. All of the findings pertain to issues such as responsiveness, vague answers, plausibility and inconsistency, which would pertain to be reviewed based on the inert testimony testimony. So there are a small handful of such adverse credibility findings that were affirmed, and I'm going to attempt to go through them in the order that they were addressed by the BIA opinion, beginning with the issue of petitioner's testimony regarding what would happen if he were returned to India. The immigration judge and the BIA found that his answers in this testimony to be nonresponsive.  When he was asked, what would happen if you were returned to India, he responded, I don't know. It could be they would kill me. Further, both of the opinions misstated the record, taking his answers out of context. They stated the I don't know answer as nonresponsive, which it still would have been a responsive answer calling for speculation, but in the context of could be they would kill me, I do not believe it would be unresponsive. Another matter of testimony that the opinions found nonresponsive was petitioner's testimony regarding his family's involvement in the Khalistani movement. Again, it's a perfectly responsive answer to a question calling for speculation. Similarly, he responded, I don't know, I don't think so, which is, again, the opinions took his answer out of context with the I don't think so, which is what makes it fully responsive, and it's clearly a question calling for speculation. Also, I believe that the opinions misstated the importance of this issue. Whether plaintiffs or, excuse me, petitioner's family were involved in Khalistani activism doesn't pertain to his claim. He never testified that he believed he was pro – that he was persecuted by the police because they believed him to be pro-Khalistani because of family involvement rather that they imputed that opinion to him because he was visibly a Sikh. The next area of testimony that was found problematic were the details or lack thereof around where he was arrested. The opinions found his testimony here to be nonresponsive and vague. On a look at the record, his answers are directly responsive to the questions asked. This was on Cross, where the government attorney inquired, when you were arrested, were you at the station or on the way to the station? To which he responded, on the way. He was asked how close, and he said, well, not very far, about 10 minutes. These answers were responsive to what was asked, so mischaracterizing the testimony as not providing enough detail, I think that that's more problematic as to what questions were asked. Next, when the petitioner was asked when he last spoke to his uncle, the BIA and the government attorney, to respond to this question, again, I point to the line of questioning. This was on Cross. And there were approximately 40 lines of transcript in which the uncle's name was mentioned at the very beginning, and the government attorney went through several different sort of convoluted developments of the question, to which Petitioner a couple times asked for clarification, which is reasonable. And by the time these 40 lines of transcript are finished, the question is completely changed, and he answered the question to the best of his ability directly and responsibly. How do we know as to that one that it wasn't the long pause between question and answer? I don't believe that that was implied by either the immigration judge's opinion or the BIA's opinion. Both of them read to me as if they were referring to the numerous questions required to get to the desired answer, is my understanding. Kennedy. There's no notice. I mean, there's nothing the IJ, for example, didn't put on the record that it's taking him so long to answer these questions. No. There was no note of, as in Huang, an actual delay in time between question and answer, rather just sort of a circuitous progression towards the answer that was desired. The next area of testimony found problematic was whether a Petitioner believes himself still to be a suspect for a bombing that occurred many, many years ago at this time. The issue there that was raised was the plausibility of this belief. There are several issues with the way this testimony is characterized. First, the decisions mischaracterized the record. Petitioner's claim and his fear of returning and the general thrust of his testimony does not have anything to do with whether he is still a suspect for the bombing. Rather, that he would be persecuted by the police for his speaking out against the police related to his brother's death. The original arrest, while the bombing may either have been a legitimate reason for the arrest or sort of a put-up for why they were arresting him as a Sikh, as someone they may have believed to be Khalistani. That's where the issue of the whether he would be a bombing suspect comes in, not the subsequent arrest, which was linked to him speaking out against the police related to his brother's disappearance. Roberts. In the interest of time, can I ask you to skip to the birth certificate? Absolutely. Because that is the one thing that I agree with you on everything you've gone through so far, but that's the last thing. You've kind of saved the best for last from the government standpoint. That was my intention. And so my purpose in going through all of the other issues was to dispose of them, hopefully clearly and quickly, and get to the remaining trivial inconsistency of the birth certificate. And so if you agree with us to this point, it is the only trivial inconsistency in the record, and it says nothing about the Petitioner's truthfulness, nor could it be construed in any way as an attempt to enhance his claim. His identity was not at issue at any point in this matter. Many, many identity documents were submitted. And our understanding is that his mistake in correction of his response regarding something so trivial, without an explanation of why this issue was so important to the immigration judge or the BIA. But his explanation makes no sense, right? That he was mistaken? No. That his uncle wasn't his uncle. He needed it for school or something, and he wasn't even in school. It made no sense why his uncle would have his birth certificate. And the reason he gave as to why that implausible scenario would be true itself made no sense, right? Yes, Your Honor. I don't believe that the actual – that the sort of provenance of the birth certificate was as much the part of – that was affirmed by the BIA so much as that he was inconsistent in his testimony, like that he directly was inconsistent with what he had said. Because he said at first – I'm just trying to remember the details. He brought it with him, and then the stamp was – anything contrary occurred. So he's testified that he brought it with him on direct. Months, years later, on cross, the topic comes up again, and he says, I might be mistaken, I might have been – I thought he was confronted with the fact that the stamp on it – That didn't happen until after he had changed his testimony. Oh, I see. The TA was going in that direction, I would assume, but very early on in the questioning on that topic. I see I've – Why did this thing – as I understand it, am I correct that this thing dragged on for four years, this hearing? It seems to have, yes. So he could have testified, you know, the first time, and then three years later you go back and – over the same question? Is that what happened to you? I believe that the government attorney wanted to readdress the issue. It was very briefly touched upon in the initial hearing. I think time ran out, and then the next hearing was for a more complete cross-examination, and so it came back up. Well, our standard is what? That we have to hold that the record compels a finding that he was credible? Yes, Your Honor. Okay. We'll hear from the government. You've got some time for a vote. Good morning, Your Honor. May it please the Court, Emanuel Palau for the Attorney General. This case involves three bases for an adverse credibility determination, demeanor, inconsistencies, and implausibilities. To start with the demeanor one, I will get to the certificate. The I.J. here had the opportunity to observe the witness, Mr. Garaya, over three separate hearings. Early on, she was concerned by his demeanor, and she called him on it and asked him, are you nervous? Are you on medication? He said no. And she cheered him on. She said, you've got to make yourself clear and give me definitive answers in support of your claim, because I'm going to be deciding your claims for relief. What does that prove? I'm not finished yet, Your Honor. His demeanor was a bit of a red flag to the I.J. after she witnessed his testimony early on, is all I'm saying. So he was testifying slowly. She said, look, you know, make your case. Yes. I don't see what that shows that he's lying. That alone says nothing. I agree with you on that. Okay. But I'm in mid-argument. Respectful, Your Honor. The point here is that she had ample opportunity to observe him over three separate hearings, and she, based on that ---- This thing drags on over four years. And she, God knows how many cases she must have heard in those four years. And, you know, I find it difficult, you know, going back two weeks later. To something without having seriously refreshed my recollection. It seems so bizarre to drag this out for four years. I don't know if it's bizarre, Your Honor. There's a massive caseload in immigration courts, and no one has ---- if you're suggesting that the witness may have forgotten what happened to him, I don't think that's fair speculation. It's interesting that the I.J. may have forgotten what the witness had testified to. Respectfully, Your Honors, I.J.'s are used to holding proceedings over those periods of time, so they had their own techniques for taking notes. Nobody has ever questioned the accuracy of her observations. Her legal correctness, yes, but no one ---- I haven't heard anyone say that she's just ---- what she's saying is just flat-out wrong. Her recollection of what happened, they all take notes and they refer to that. But the record indicate why this dragged on, who was asking for continuance? Not to my knowledge, Your Honor. There's any number of reasons that are ---- I believe ---- I'm doing two cases to help me not confuse them. I believe in this case there was a possible application for adjustment of status that was pending in the background. That may have had a reason for one of the ---- some of the delay. But it's not unusual to have a delay like this. And just to get back to the demeanor piece of this, the I.J. here didn't just say his demeanor is ---- convinces me he's not telling the truth. She gave examples of testimony and her generalization was because of his equivocal answers, his nonresponsive answers, his hedging, she got the distinct impression based on someone who has heard ---- I don't know about the judge in particular, but that's all they do is hear these cases day in and day out. Her impression was that he was trying to test various answers and assess their impact on his case and see which one would please the Court the most. And what she pointed out, then she gave specific examples. One was ---- Roberts, none of which actually back up the conclusion she started with. That's the problem. I mean, the so-called demeanor findings here are based on things that we are in a good position to evaluate for ourselves. So, for example, in terms of whether an answer is nonresponsive or vague, I read through the relevant excerpts here and I thought the IJ must be smoking crack, to borrow a phrase from one of my colleagues on the district court. I didn't understand where the IJ came up with the conclusions, because you could read the testimony and it didn't match at all. Well, I think one point I would make is that nonresponsive doesn't just mean you don't answer a question. It means the words you say don't respond to what was just asked of you. And there were several examples of that. And when that keeps happening over and over ---- Roberts, no, it didn't. That's what I'm saying. I read the answers. I mean, I read the questions put to him and I read the answers and they were perfectly responsive. Now, maybe the IJ wanted greater certainty in response to a question that called for utter speculation on something that the Petitioner wouldn't have any personal knowledge, but you can't fault the Petitioner for that. He was trying to be honest. I think the element that I see in the record, and again, your decision is worn over and over, the reason you give such deference to those findings is because you can't always look at the cold record and see what the IJ saw. And you certainly entitled, I don't disagree with your argument. Didn't the BIA itself reject some of the things that the IJ had found? The BIA, as I said, I believe they were referring to the inconsistencies she cited. I believe what the BIA said was we don't accept every single inconsistency she notes as probative. In a footnote, they addressed two of them, specifically saying those are weak inconsistencies, we're not going to rely on those. But, I mean, that's par for the course with many of these decisions, is that the agency puts out its reasons. They're not all going to be, you know, bulletproof or top ten. It's a range, it's a continuum. But I think what's missing here, I understand what you're saying, Judge Watford, that I think my answer to the delay or the timing part is it took a long time and lots of questions in the judge's opinion viewing this to get to certain points which she thought were pretty readily, you should have had a yes or no answer or I don't know or I don't remember. And on that point, the birth certificate is a bit of an example. That's an inconsistency, but it's also a situation where it's not part of his claim. Everyone knows he is who he says he is, but the issue is, does that have, does his response to the questions on the birth certificate, does that have any bearing on his veracity, not the merits of his claim? And here he said flat out on direct examination that I brought this with me from India. And then on cross-examination, he began to express doubts about whether he did or didn't. Then he's -- And is your opponent right that he changed the, he said that, well, my uncle must have sent it to me, that was the second version? No, I believe he said flat out. Yeah. Version two was I had my uncle send it to me then. Okay. And that occurred before he was confronted with the fact that the dates just didn't line up with his original version? It's all right. Yes, yes. Yes, I'm sorry. On cross, he said my uncle must have sent it to me, and then I believe he was asked about the stamps from 2008, which is two years after. I'm sorry. The first question was how would your uncle ever get hold of your birth certificate? His answer was because my school had it. Nonresponsive, and he's changing his answer yet again. And finally, he said flat out, when he confronted him with the stamps, he said I don't know anything about it. End of story. So that's these are factual inconsistencies. And they go to his veracity, because if he didn't recall that he brought it, just say so. Or I don't remember. I'm sorry. And, of course, this is totally insignificant to anything. Well, were you going to serve him a drink? It is significant. I disagree, Your Honor. It's significant as to whether he's telling the truth or not. If he's willing to change his story and make something up about a minor item, which is his birth certificate, which he himself is submitting to the I.J. and saying please accept this as a legitimate document. Well, what purpose? What purpose was he submitting his birth certificate? You'll have to ask him that. I don't know. It's not required in his case. He chose to submit it, and he didn't. And the same thing with his passport, again, something he chose to submit as a piece of evidence. And he was asked a very simple question. When did you get your passport? How long did it take you to get it? He hemmed and hawed about that. And then he said, why did you get your passport? And he said, just like that, nonresponsive. The I.J. called him on it. He said, my father told me to get it. And then later on in the third hearing, he said, I got it so I could have another form of I.D. So these are inconsistencies that I agree with you have nothing to do with his merits of his claim, but they do have a bearing on his veracity, his willingness to tell the truth. And if he's willing to misrepresent about small items, I think there's a fair inference there. So between the inconsistencies, the demeanor, and the implausibilities, I think that the – and the bottom line is that the – there's no extraordinary circumstances shown here to overturn the demeanor finding of the Court, and if the Court does, there are still inconsistencies under the Real I.D. Act which would support the decision. Thank you, Your Honor. In the Scharista case, Judge Gould wrote that there's a measure of truth to the suggestion of a commentator that immigration judges have the power to consider any inconsistency, that immigration judges have the power to consider any inconsistency is quite distinct from the issue whether the inconsistency cited support an adverse credibility determination. I don't disagree with that. Hmm? You don't agree with that? I don't disagree with that. Well, do these inconsistencies support an adverse credibility determination? Yes, sir, because they go to the – again, I think what you're asking me is do they go to the merits of his claim in any way? Is he telling the truth about his claim? And they don't have a direct bearing on his testimony about what happened in India. However, he submitted these documents in support of his claim, and he changed his story demonstrably about how he came to get those, and that suggests – I think those are black and white inconsistencies, and they go to his truth-telling, his veracity, his credibility. That's our position, Your Honor. Thank you, counsel. Thank you, Your Honor. Let's hear from counsel for Petitioner. Thank you, Your Honors. I'd like to take some of this time to clear up some of the questions that you had on my first discussion. First, part of the reason why this case dragged on for so many years was that smaller – that smaller issues got blown up. So, for instance, there was a long cross-examination of the Petitioner's wife at the first hearing by the government attorney regarding whether Petitioner had ever lived at various addresses in Southern California. Then the government – so the birth certificate was introduced as part of the introduction to the case on direct, saying, you know, what is your name, when were you born, is this your birth certificate, to authenticate that the Petitioner was who he claimed he was, and then direct proceeded. The government attorney made an issue of the birth certificate and spent, I believe, about ten pages of the transcript examining stamps and asking if the interpreter could help read them, and sort of going on about this issue, which is why cross didn't get addressed at that initial hearing. Then the cross-examination followed, and then there was another issue. The government attorney wanted additional school records to confirm that Petitioner had spent three months repeating a class, which we then came back and provided, of course. So that's part of the delay. And the government raised the issue that the immigration judge had early on in the hearing raised a demeanor finding that Petitioner was not testifying, you know, had said, I'm going to need you to speak up. On careful review of the record, it happens throughout where it's microphone issues. The immigration judge and the interpreter are clearly coaching him on how to use a microphone. A couple pages after that, the interaction that was just cited, Petitioner checks in with the judge and says, how is my level? How am I doing? I think it was very clearly someone who is not used to communicating in this format having an understandable act. I struggled with his microphone.  Yes, Your Honor. That is that he appeared to be testifying that one of the reasons that he feared persecution when he returned to India is because he had been suspected of the bombing of the railroad station, and that he had been persecuted in the past because of that suspicion. And it seems to me that it is implausible that he is going to be picked up again on account of that railroad station bombing. And the BIA was saying because we now, everybody now knows that it wasn't Sikhs who did it. Yes, Your Honor. I think that's a bit of a mischaracterization of his core fear. I think that becomes, that supports what he's afraid of. So he's afraid that the police will continue to persecute him because he spoke out against the police for corruption, possibly related to his brother. And the issue of whether he would or would not be a suspect for that is more linked to when he was released from custody, he was made to sign a blank document. This is something we hear about a lot. He was made to sign a blank paper with his signature, and he's afraid that any charge could be brought against him as a, again, as a put-up. Why? Just is it generalized because he's Sikh or what? I don't understand the basis that you're quite, that is clear in the record, compelling that he will be picked up if we say that he's. Yes, Your Honor. I think that there are two different reasons why he might be persecuted. One, we do have lots of evidence, and I'm sure we submitted tons of country conditions with this matter, that Sikhs are commonly persecuted. However, I think that the more persuasive issue is that he was actively speaking out against police corruption and police behavior in his community. The fact that he happens to be a Sikh and a member of a more vulnerable both political, social, religious class merely makes him easier for the police to target for such behavior. And, again, I think the link to whether he could be found to be a suspect is more of the amorphous, well, yeah, they could charge me with anything. They could push anything. Yes, but was, is there testimony that you say must be compelled to be credible that he was in the past arrested on that ground? That he was arrested? For his criticism of corruption. I believe that that testimony is not challenged anywhere in the record, that that's why he was arrested. His second arrest was for that persecution. Second arrest was for that. Yes. Okay. Thank you, counsel. Thank you. The case just argued is submitted.
judges: Schroeder, Watford, Korman